OSCN Found Document:IN THE MATTER OF THE DEATH OF TAYLOR

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 IN THE MATTER OF THE DEATH OF TAYLOR
2015 OK CIV APP 11
343 P.3d 219
Case Number: 112225
Decided: 09/26/2014
Mandate Issued: 01/30/2015
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2015 OK CIV APP 11, 343 P.3d 219

 

WELLS FARGO BANK, NATIONAL ASSOCIATION, 
Plaintiff/Appellee,
v.
APACHE TRIBE OF OKLAHOMA, Defendant/Appellant.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, 
OKLAHOMA
HONORABLE BILL GRAVES, TRIAL JUDGE

AFFIRMED IN PART, REVERSED IN PART, AND 
REMANDED FOR FURTHER PROCEEDINGS

Jon E. Brightmire, DOERNER, SAUNDERS, DANIEL & ANDERSON, L.L.P., Tulsa, 
Oklahoma, for Defendant/Appellant
Patrick M. Ryan, Phillip G. Whaley, RYAN 
WHALEY COLDIRON SHANDY PLLC, Oklahoma City, Oklahoma, and Jerome A. Miranowski, 
Michael M. Krauss, FAEGRE BAKER DANIELS LLP, Minneapolis, Minnesota, for 
Plaintiff/Appellee


JOHN F. FISCHER, PRESIDING JUDGE:
¶1 This case arises from Wells Fargo Bank's efforts to collect the balance of 
a $4,365,000 loan to the Apache Tribe of Oklahoma. The Tribe appeals various 
rulings of the district court in these consolidated appeals.[1] Principally, the Tribe 
challenges the district court's Judgment confirming an arbitration award in 
favor of the Bank, arguing it did not waive sovereign immunity or consent to be 
sued in Oklahoma district court. We find that there was a valid and express 
waiver of the Tribe's sovereign immunity, that the Tribe's agreement to 
arbitrate this dispute with the Bank is enforceable and that the arbitrator did 
not exceed his authority in awarding the Bank the unpaid balance of its loan. 
Therefore, the district court's Judgment confirming that portion of the 
arbitration award is affirmed as are the subsequent orders issued in aid of the 
Bank's effort to collect its Judgment.[2]
BACKGROUND
¶2 The Apache Tribe of Oklahoma is a federally recognized Indian tribe. The 
Tribe adopted a Constitution in 1972. Pursuant to Article II of that 
Constitution, the members of the Tribe who are at least eighteen years of age 
constitute the General Council and the General Council is the "supreme governing 
body" of the Tribe. [3] The Business Committee of the Apache Tribe of 
Oklahoma was established by the tribal council pursuant to authority granted in 
Article V of the Tribe's Constitution: "There shall be a business committee 
which shall consist of the officers as provided in Article IV and two (2) 
members." On August 26, 1972, the tribal council passed Resolution 73-1 
delegating the Tribe's "full and complete authority to the Business Committee to 
transact any and all business related to the tribe involving matters such as 
tribal land, tribal budget and any other matters relating to government programs 
and the Bureau of Indian Affairs. . . ." On September 10, 1977, the tribal 
council passed Resolution 78-7 to "go on record similar to Resolution 73-1 to 
delegate authority to transact business related to the Apache Tribe of Oklahoma" 
to the Business Committee.
¶3 On May 9, 2006, the Tribe opened its Silver Buffalo Casino in Anadarko, 
Oklahoma. In August of 2007, members of the Business Committee and Wells Fargo 
Bank discussed a possible loan in the amount of $4,365,000. The loan proceeds 
were intended to be used by the Tribe to pay off existing debt, expand and 
remodel the Casino and to acquire land. On June 23, 2008, the Business 
Committee, by a vote of 3 to 0, adopted Resolution 06-23-08 approving the 
financing transaction with the Bank and the documents necessary to complete the 
loan transaction. The Resolution contained an express waiver of the Tribe's 
sovereign immunity. Also on June 23, 2008, the Business Committee signed a loan 
agreement, promissory note, security agreement and related documents (Loan 
Agreement) with the Bank to complete the loan transaction. The Loan Agreement 
included a waiver of the Tribe's sovereign immunity with respect to the loan 
transaction, an agreement to arbitrate disputes with the Bank and a choice of 
law provision designating Oklahoma law for the construction and enforcement of 
the Loan Agreement.
¶4 Paragraph 11.19 of the Loan Agreement titled "Governing Law," provides, in 
part:

 
 (a) This Agreement and the Loan Documents shall be governed by, construed 
 and enforced in accordance with, the internal law of the State of Oklahoma . 
 . . . The [Tribe] . . . consents to the application of Oklahoma civil law to 
 the construction, interpretation and enforcement of this Agreement and the 
 other Loan Documents, and to the application of Oklahoma civil law to the 
 procedural aspects of any suit, action or proceeding relating thereto, 
 including, but not limited to, legal process, execution of judgments, 
 enforcement of any arbitration award and other legal remedies . . . 
 .
¶5 Paragraph 11.24 of the Loan Agreement provides, in part:

 
 (a) Arbitration. Upon the demand of any party , any Dispute . . . 
 shall be resolved by binding arbitration in accordance with the terms of 
 this Agreement. A "Dispute" means any action, dispute, claim, or controversy 
 of any kind, whether in contract or tort, statutory or common law, legal or 
 equitable, now existing or hereafter arising under or in connection with, or 
 in any way pertaining to any of the Loan Documents. . . .
 (b) Governing Rules. Arbitration proceedings shall be administered 
 by the American Arbitration Association ("AAA") or such other administrator 
 as the parties shall mutually agree upon in accordance with the AAA 
 Commercial Arbitration Rules. All Disputes submitted to arbitration shall be 
 resolved in accordance with the Federal Arbitration Act. . . . Judgment upon 
 any award rendered in an arbitration may be entered in any court having 
 jurisdiction . . . .
¶6 Paragraph 11.27 of the Loan Agreement is titled: "WAIVER OF SOVEREIGN 
IMMUNITY; CONSENT TO JURISDICTION, and provides, in part:

 
 (A) THE [TRIBE] HEREBY EXPRESSLY AND IRREVOCABLY WAIVES ITS SOVEREIGN 
 IMMUNITY (AND ANY DEFENSE BASED THEREON) FROM ANY SUIT, ACTION, OR 
 PROCEEDING (INCLUDING AN ARBITRATION PROCEEDING) OR FROM ANY LEGAL PROCESS 
 (WHETHER THROUGH SERVICE OF NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT 
 IN AID OF EXECUTION, EXECUTION, EXERCISE OF CONTEMPT POWERS, OR OTHERWISE) 
 IN ANY FORUM, WITH RESPECT TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS 
 AND THE TRANSACTIONS CONTEMPLATED HEREBY. . . .
 (B) THE [TRIBE] HEREBY EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION 
 OF THE COURTS OF THE STATE OF OKLAHOMA . . . .
 . . . .
 (D) IN THE EVENT A SUIT IS COMMENCED ON THIS AGREEMEMNT . . . (INCLUDING 
 FOR THE ENFORCEMENT OF AN ARBITRATION AWARD), THE [TRIBE] COVENANTS THAT IT 
 WILL NOT DISPUTE THE JURISDICTION OF THE COURTS OF THE STATE OF OKLAHOMA . . 
 . . (emphasis in original).
¶7 After consummation of the loan transaction and transfer of the loan 
proceeds, the Tribe failed to make the interest payment due on the loan for 
August of 2010.[4] The Bank filed its request for arbitration on 
September 28, 2010, alleging the Tribe had breached the loan agreement. The 
parties selected an arbitrator and on May 23, 2011, after five days of trial, 
the arbitrator entered an award in favor of the Bank in the amount of 
$2,751,160.20 (Arbitration Award). The Bank filed this action in the district 
court on May 24, 2011. The district court confirmed the arbitration award and 
entered judgment in favor of the Bank on November 15, 2011.
¶8 On March 19, 2012, the Bank obtained a temporary restraining order 
prohibiting the transfer of casino funds, other than winnings, until further 
order of the district court, and the matter was set for hearing on the Bank's 
motion to require the Tribe to turn over casino funds in satisfaction of the 
Bank's Judgment. On March 27, 2012, the district court denied the Tribe's motion 
to vacate the March 19 order. On April 3, 2012, the district court granted the 
Bank's pending motion and ordered the Tribe to turn over $130,000 "from casinos' 
money" to counsel for the Bank.
¶9 Four orders have been appealed and are consolidated for review in this 
case:

 
 1. November 15, 2011, Order and Judgment Confirming Arbitration Award, 
 case number 110,194 (Judgment);
 2. March 19, 2012, Order Granting Temporary Restraining Order 
 (Injunction[5]) and March 27, 2012, Order Denying Apache Tribe 
 of Oklahoma's Motion to Vacate March 19 Order Granting Temporary Restraining 
 Order (March 27 Order), case number 110,548; and
 3. April 3, 2012, Order Compelling the Turnover of Cash Held at the 
 Silver Buffalo and Golden Eagle Casinos (Turnover Order), case number 
 110,648.
Oral argument was held in this Court with respect to the Tribe's appeal in 
case no. 110,194 on August 13, 2013.
STANDARD OF REVIEW
¶10 In confirming the Bank's arbitration award, the district court 
determined, as did the arbitrator, that the parties agreed to arbitrate any 
dispute regarding the Loan Agreement. The district court's "first task" in 
ruling on that issue "is to determine whether the parties agreed to arbitrate 
that dispute." Wilkinson v. Dean Witter Reynolds, Inc., 1997 OK 20, ¶ 9, 933 P.2d 878, 880, citing 
Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 
626, 106 S. Ct. 3346, 3353 (1985). That determination is generally governed by 
principles of state contract law. First Options of Chicago Inc., v. 
Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924 (1995); Rogers v. Dell 
Computer Corporation, 2005 OK 
51, ¶ 14, 138 P.3d 826, 830. 
We review the district court's legal decisions regarding the existence of an 
agreement to arbitrate de novo and accept its findings of fact that are 
not clearly erroneous. Kaplan, 514 U.S. at 947-49, 115 S. Ct. at 
1923.
¶11 However, to the extent the parties have agreed to arbitrate their 
disputes, judicial review of the substance of the arbitration award is 
constrained. A court "will set [an arbitrator's] decision aside only in very 
unusual circumstances." Kaplan, 514 U.S. at 942, 115 S. Ct. at 1923 
(citing Title 9 U.S.C. § 10 (2002)). As pertinent to the Tribe's appeal, the 
arbitration award may be vacated if "the arbitrators exceeded their powers." 9 
U.S.C. § 10(a)(4) (2002).[6]
¶12 The Tribe's appeal of the district court's post-Judgment orders raises 
only issues of law. "Questions of law are reviewed de novo. De 
novo review of a lower court's legal ruling is plenary, independent and 
nondeferential." Lierly v. Tidewater Petroleum Corp., 2006 OK 47, ¶ 16, 139 P.3d 897, 903.
ANALYSIS
¶13 The Tribe has limited its appeal of the Judgment confirming the 
Arbitration Award to two issues: 1. Did the Business Committee have authority to 
waive the Tribe's sovereign immunity and sign the Loan Agreement? 2. If so, did 
the assignment of Casino revenues to secure repayment of the loan convert the 
Loan Agreement into a void management agreement? With respect to the first 
issue, it is undisputed that the Loan Agreement contains an arbitration 
agreement, which covers the disputed issues in this case and that the Loan 
Agreement was signed by the Chairman of the Business Committee. However, the 
Tribe argues that the Chairman did not have authority to sign the Loan 
Agreement, at least to the extent that the document contained a waiver of 
sovereign immunity or an agreement to arbitrate any disputes with the Bank. 
Therefore, the determination of whether the parties agreed to arbitrate this 
dispute, arbitrability, depends on whether the Chairman had the authority to 
sign the Loan Agreement. The arbitrator found that the Chairman had the 
requisite authority and that the arbitration agreement was enforceable against 
the Tribe. However, we must first determine who, court or arbitrator, decides 
that issue by determining whether the parties agreed to submit the issue of 
arbitrability to arbitration. Kaplan, 514 U.S. at 942, 115 S. Ct. at 
1923.
I. Arbitrability of the Tribe's Jurisdictional Claim
¶14 Ordinarily, and unless the parties have clearly agreed that the 
arbitrator is to decide that issue of arbitrability , the court will decide 
whether an agreement to arbitrate exists and, if so, whether the parties have 
agreed to any limitation on the issues they have agreed to arbitrate using 
standard principles of state contract construction law. Kaplan, 514 U.S. 
at 944, 115 S. Ct. at 1924. As previously described, paragraph 11.24 of the Loan 
Agreement contains an agreement to resolve any dispute regarding the Loan 
Agreement by binding arbitration in accordance with the Federal Arbitration 
Act.[7]
¶15 The Bank argues that the parties agreed that the arbitrator would decide 
the initial issue of arbitrability and that Oklahoma courts are, therefore, 
bound by the arbitrator's determination that the Tribe waived sovereign immunity 
and agreed to arbitrate this dispute: "The parties agreed the [arbitrator] would 
resolve both questions of jurisdiction and of the Loan Agreement's existence and 
validity." (Appellee's Answer Brief, p. 8). The Bank bases this argument on 
paragraph 11.24(b) of the Loan Agreement which provides, in part: "Arbitration 
proceedings shall be administered by the American Arbitration Association 
("AAA") or such other administrator as the parties shall mutually agree upon in 
accordance with the AAA Commercial Arbitration Rules." The Bank notes that the 
Commercial Arbitration Rules of the AAA provide that the arbitrator has the 
power to "rule on his or her own jurisdiction." The Bank cites numerous cases 
from various jurisdictions holding that an arbitrator decides the question of 
arbitrability including jurisdiction if the arbitration contract incorporates 
the rules of the AAA. We find these cases distinguishable.
¶16 For example, in Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366 (Fed. 
Cir. 2006), the arbitration agreement provided: "Any dispute . . . shall be 
settled by arbitration in accordance with the arbitration rules of the American 
Arbitration Association." Id. at 1368. Noting that Article 15 of those 
rules authorized arbitrators to rule on their own jurisdiction, the 
Qualcomm court held that the parties had agreed to arbitrate the issue of 
arbitrability. In contrast, the arbitration provision in the Loan Agreement here 
does not incorporate the substantive rules of the AAA except with respect to the 
process of selecting an administrator other than the AAA should that be 
necessary. The relevant provision in the Loan Agreement merely provides that any 
arbitration proceeding will be "administered by the American Arbitration 
Association." We find a clear distinction between an agreement to use the AAA's 
staff and procedures for the selection of arbitrators in the administration of 
an arbitration proceeding, for example, and an agreement regarding the scope of 
the arbitrator's authority and what substantive issues the arbitrator will be 
authorized to decide.
¶17 Further, if the Bank's construction of paragraph 11.24(b) is correct, the 
lengthy definition of the "Dispute" the parties agree to arbitrate contained in 
paragraph 11.24(a) of the Loan Agreement is essentially unnecessary because the 
AAA Commercial Rules provide that the arbitrator can decide any claim or 
counterclaim unless the opposing party objects to the arbitrability of that 
claim. More importantly, although the definition of "Dispute" in the Loan 
Agreement is broad, there is no express reference to the issue of the 
arbitrator's jurisdiction in the list of the matters the parties are agreeing to 
arbitrate. This omission is more striking in light of the long-standing and 
clear federal law on this issue. "Unless the parties clearly and unmistakably 
provide otherwise, the question of whether the parties agreed to arbitrate is to 
be decided by the court, not the arbitrator." AT&T Techs., Inc. v. 
Commc'ns Workers of Am., 475 U.S. 643, 649, 106 S. Ct. 1415, 1418 (1986). 
"Courts should not assume that the parties agreed to arbitrate arbitrability 
unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." 
Kaplan, 514 U.S. at 944, 115 S. Ct. at 1924. As the Kaplan Court 
observed, "[a] party often might not focus upon" who decides arbitrability. 
Consequently:

 
 courts might hesitate to interpret silence or ambiguity on the "who 
 should decide arbitrability" point as giving the arbitrators that power, for 
 doing so might too often force unwilling parties to arbitrate a matter they 
 reasonably would have thought a judge, not an arbitrator, would 
 decide.
Id. at 945, 115 S. Ct. at 1925. That principle is particularly 
relevant when one party to the arbitration agreement is an Indian tribe. "[T]o 
relinquish its immunity, a tribe's waiver must be 'clear.'" C&L Enters., 
Inc. v. Citizens Band Potawatomi Indian Tribe of Oklahoma, 532 U.S. 411, 
418, 121 S. Ct. 1589, 1594 (2001). We find that the determination of the 
arbitrability issue by reference to rules incorporated into but not expressly 
stated in the arbitration provision fails to waive with the "requisite clarity" 
the Apache Tribe's sovereign immunity. Id.
¶18 Consequently, we do not find the Bank's argument that the parties agreed 
the arbitrator would decide arbitrability to be persuasive. Therefore, the 
arbitrator's decision that the arbitration provision in the Loan Agreement 
constitutes a valid waiver of the Tribe's sovereign immunity exceeded the 
arbitrator's authority and is not binding on the parties or this Court. 
See 9 U.S.C. § 10(a)(4) (2002) (judicial review of an arbitration award 
determines whether an arbitrator exceeded his power). This Court will determine 
whether the Business Committee of the Apache Tribe was authorized to, and, if 
so, did waive the Tribe's sovereign immunity and agree to arbitrate disputes 
concerning the loan transaction with the Bank.
II. Waiver of Sovereign Immunity
¶19 The foundational law dispositive of the sovereign immunity issue is well 
settled.

 
 Indian tribes are "distinct, independent political communities, retaining 
 their original natural rights" in matters of local self-government. Although 
 no longer "possessed of the full attributes of sovereignty," they remain a 
 "separate people, with the power of regulating their internal and social 
 relations."
Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55, 98 S. Ct. 1670, 1675 
(1978) (internal citations omitted); Worcester v. Georgia, 31 U.S. (6 
Pet.) 515 (1832). "Indian tribes have long been recognized as possessing the 
common-law immunity from suit traditionally enjoyed by sovereign powers." 
Santa Clara Pueblo, 436 U.S. at 58, 98 S. Ct. at 1677 (citing Turner 
v. United States, 248 U.S. 354, 358, 39 S. Ct. 109, 110 (1919)); United 
States v. United States Fid. & Guar. Co., 309 U.S. 506, 512-13, 60 S. 
Ct. 653, 656 (1940); Puyallup Tribe, Inc. v. Washington Dep't of Game, 
433 U.S. 165, 172-173, 97 S. Ct. 2616, 2620-21 (1977). "As a matter of federal 
law, an Indian tribe is subject to suit only where Congress has authorized the 
suit or the tribe has waived its immunity." Kiowa Tribe of Oklahoma v. 
Manufacturing Techs., Inc., 523 U.S. 751, 754, 118 S. Ct. 1700, 1702 
(1998).[8] There 
is no Congressional authorization for the Bank's suit in this case. This case is 
determined by whether the Tribe voluntarily waived its sovereign immunity. That 
determination depends on whether the Business Committee had authority to sign 
the Loan Agreement because the Loan Agreement contains a clear and effective 
waiver of immunity. Determining the Business Committee's authority requires 
construction of the Apache Constitution and the two General Council Resolutions 
authorizing the Business Committee to conduct business on behalf of the Tribe.[9]
¶20 The first issue we must resolve, however, is what law to apply when 
construing those documents. We have found no controlling authority directly 
responsive to that issue. In "appropriate cases," common law rules of contract 
construction are applied to interpret agreements between Indian tribes and 
non-Indian entities. C&L Enters., 532 U.S. at 423, 121 S. Ct. at 1596 
(state arbitration act applies where the parties agreed to arbitrate disputes, 
their contract contained a choice-of-law clause providing state law governed the 
contract and authority to sign the contract was not an issue). However, we do 
not find it would be "appropriate" to apply Oklahoma law in the interpretation 
of the Tribe's documents even considering the choice-of-law provision in 
paragraph 11.19 of the Loan Agreement. The Tribe's agreement to application of 
Oklahoma law and its canons of construction in that provision is limited to 
"construction, interpretation" of the Loan Agreement. Further, we note that 
"standard principles of statutory construction do not have their usual force in 
cases involving Indian law." Montana v. Blackfeet Tribe of Indians, 471 
U.S. 759, 766, 105 S. Ct. 2399, 2403 (1985).
¶21 We also decline to apply state agency law to determine internal tribal 
matters including the authority of the Business Committee and its members when 
purporting to waive the Tribe's immunity, in the absence of the Tribe's or the 
Committee's agreement to do so. Accord Stillaguamish Tribe of Indians v. 
Pilchuck Group II, L.L.C., No. C10-995RAJ, 2011 WL 4001088 (W.D.Wash. Sept. 
2, 2011) (unpublished)(state law has no bearing on who has authority to waive 
tribe's immunity). But cf., Rush Creek Solutions, Inc., v. Ute 
Mountain Ute Tribe, 107 P.3d 402 (Colo. Ct. App. 2004) (where tribal 
constitution was silent as to the method of waiving sovereign immunity and CFO 
was authorized to sign contracts, Indian tribe was bound by waiver in contract 
signed by CFO pursuant to state law principle of apparent authority). Rush 
Creek, in our view, impermissibly finds a waiver (1) through application of 
state law to internal tribal matters without showing the tribe agreed state law 
would apply, and (2) as a result of conduct imputed to the tribe without showing 
the tribe authorized, consented to, adopted or ratified that conduct. As a 
result, the Rush Creek Court posits tribal immunity as a matter of state 
law in conflict with United States Supreme Court authority. "[T]ribal immunity 
is a matter of federal law and is not subject to diminution by the States." 
Kiowa Tribe of Oklahoma, 523 U.S. at 756, 118 S. Ct. 1703. Rush 
Creek is also distinguishable with respect to the procedure for waiver of 
tribal immunity. The Colorado appellate court found the tribe's Constitution was 
silent as to the manner in which immunity could be waived. Here, that is not an 
issue. The General Council's constitutional authority to waive the Tribe's 
immunity from suit or delegate that power to the Business Committee is not an 
issue in this case as discussed post. In this jurisdiction, the rule is 
settled: if an Indian tribe has specified the manner in which its immunity can 
be waived, "tribal law controls the way sovereign immunity can be waived by the 
Tribe." Dilliner v. Seneca-Cayuga Tribe, 2011 OK 61, ¶ 18, 258 P.3d 516, 520. This rule 
requires an affirmative act compliant with tribal law and procedure that clearly 
justifies the constitutional exercise of state court jurisdiction. C&L 
Enters., 532 U.S. at 418, 121 S. Ct. at 1594.
¶22 Therefore, in the absence of an agreement to apply Oklahoma law, we 
conclude that interpretation of the Apache Constitution, the 1973 and 1978 
Resolutions and the determination of whether the General Council delegated 
authority to the Business Committee to waive sovereign immunity is a matter of 
Apache Tribal law. "Courts have looked to tribal law in determining 
jurisdiction." Dilliner, 2011 
OK 61, ¶ 13, 258 P.3d at 519. We also reach this conclusion "in light of 
traditional notions of Indian sovereignty and the congressional goal of Indian 
self-government, including its 'overriding goal' of encouraging tribal 
self-sufficiency and economic development." California v. Cabazon Band of 
Mission Indians, 480 U.S. 202, 216, 107 S. Ct. 1083, 1092 (1987). Finally, 
we recognize that the "sovereignty retained by tribes includes 'the power of 
regulating their internal and social relations,'" including "the power to make 
their own substantive law in internal matters." New Mexico v. Mescalero 
Apache Tribe, 462 U.S. 324, 332, 103 S. Ct. 2378, 2385 (1983).
¶23 Nonetheless, we have not been provided any Apache statutes, ordinances or 
case law that could be used to derive rules of construction applicable to the 
Tribe's documents in order to determine whether the Business Committee was 
delegated authority to waive the Tribe's immunity from suit in this case. In its 
Petition for Rehearing, the Tribe argues the appropriate rules of construction 
are stated in MM&A Productions, LLC v. Yavapai-Apache Nation, 316 
P.3d 1248, 1251-52 (Ariz. Ct. App. 2014):

 
 . . . waivers of sovereign immunity are strictly construed in favor of 
 the sovereign. Ramey Constr. Co. v. Apache Tribe of Mescalero 
 Reservation, 673 F.2d 315, 320 (10th Cir.1982). The United States 
 Supreme Court has articulated repeatedly that a waiver of sovereign immunity 
 '''cannot be implied but must be unequivocally expressed.'" Santa Clara 
 Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 
 (1978), quoting United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 
 948, 47 L.Ed.2d 114 (1976). In other words, the waiver must "expressly 
 indicate[ ] the [tribe]'s consent" to suit. Pan Am. Co., 884 F.2d at 
 418.
We are not persuaded. First, Ramey Construction involved a suit by a 
contractor against a tribe for the balance due on a construction contract. The 
contractor argued Congress had waived the tribe's immunity in and the court had 
jurisdiction pursuant to the Indian Civil Rights Act, 25 U.S.C. §§ 1301 to 1341, 
because the tribe's refusal to pay the balance was a denial of equal protection, 
due process and access to the courts. As the Ramey Construction Court 
correctly noted, Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 
1670 (1978) resolved the contractor's claim: "suits against the tribe under the 
ICRA are barred by its sovereign immunity from suit." Id., 436 U.S. at 
59, 98 S. Ct. 1677. Ramey Construction and Santa Clara Pueblo 
dealt with Congressional waivers of sovereign immunity, an issue distinct from 
the tribal waiver at issue in this case. Like the United States Court of Appeals 
for the Seventh Circuit, we "doubt whether there really is a requirement that 
a tribe's waiver of its sovereign immunity be explicit, especially since 
the harder it is for the tribe to waive its sovereign immunity the harder it is 
for it to make advantageous business transactions." Sokaogon Gaming 
Enterprise Corp. v. Tushie-Montgomery Associates, Inc., 86 F.3d 656 (7th 
Cir. 1996) (emphasis added)(agreement to arbitrate disputes constituted a clear 
waiver of tribal sovereign immunity). The Tribe has failed to demonstrate the 
applicability of the Santa Clara Pueblo rule applied in Ramsey 
Construction for Congressional waivers to the tribal waiver at issue in this 
case.
¶24 Second, the viability of Pan American Co. v. Sycuan Band of Mission 
Indians, 884 F.2d 416 (9th Cir.1989), the third case relied on by the 
MM&A Court is, at best, questionable. That case concerned whether a 
tribe waived immunity from suit by agreeing to an arbitration clause. The Pan 
Am Court reasoned: "Santa Clara Pueblo commands that waiver may only 
be found if the clause unequivocally and expressly indicates the Band's consent 
to waive its sovereign immunity." Pan American, 848 F.2d at 418. 
As previously discussed, Santa Clara Pueblo established the rule for 
determining when Congress has waived a tribe's immunity from suit. Where 
voluntary waiver by an Indian tribe is the issue, the applicable rule is stated 
in C&L Enterprises: "[T]o relinquish its immunity, a tribe's waiver 
must be 'clear,'" contrasting the "similar" but apparently not identical 
"unequivocally expressed" rule required by Santa Clara Pueblo for 
Congressional waivers. C&L Enters., 532 U.S. at 418, 121 S. Ct. at 
1594.[10] 
And, unlike the Pan Am Court, the C&L Enterprises Court found 
the tribe waived its immunity from suit with the "requisite clarity" when it 
signed a contract that included an agreement to arbitrate disputes. Id. 
Not only was C&L Enterprises decided twelve years after Pan 
Am, but also the C&L Enterprises Court granted certiorari in that 
case to specifically resolve the conflict between the Ninth Circuit view as 
stated in Pan Am and the view of "several state and federal courts." 
Id., 532 U.S. at 417-418, 121 S. Ct. at 1594. In our view, the holding in 
Pan Am has been abrogated. Therefore, we find no basis for the 
MM&A Court's conclusion that to be effective, a waiver of sovereign 
immunity must unequivocally express a tribe's consent to suit. However, we need 
not decide whether there is any real distinction between the Santa Clara 
Pueblo "unequivocally expressed" rule and the C&L Enterprises 
"clear waiver" rule.[11] "No case has ever held" that an Indian tribe must 
use the words "sovereign immunity" to effect an explicit waiver of that 
immunity. C&L Enters., 532 U.S. at 420, 121 S. Ct. at 1595, citing 
this "cogent observation" in Sokaogon, 86 F.3d at 660, with approval.
¶25 Third, we agree with the MM&A Court that there is a difference 
between delegation of tribal authority to waive sovereign immunity and the 
actual waiver of that immunity. The standard applicable in each circumstance is 
the precise issue we must resolve in this case. We do not agree, however, with 
the MM&A Court's resolution of that issue:

 
 Express authorization and express language are two distinct but related 
 issues, and requiring an express delegation of a tribe's authority to waive 
 its immunity is a logical and consistent application of the overarching 
 principle encompassing both issues: that the tribe itself must expressly 
 consent to a waiver of its immunity. See Santa Clara Pueblo, 436 U.S. 
 at 58, 98 S.Ct. 1670; Pan Am. Co., 884 F.2d at 418. To hold otherwise 
 would result in waivers that could not be traced to any explicit action by a 
 tribe.
MM&A, 316 P.3d at 1253. For the reasons previously stated, 
Santa Clara Pueblo does not require this result. And, we decline to adopt 
the view urged by the Tribe: "the General Council must expressly state in the 
authorizing resolutions that the Business Committee has the authority to waive 
the Tribe's sovereign immunity." Although C&L Enterprises and similar 
cases have established the law with respect to determining when a tribe has 
waived its immunity from suit, only by implication do those cases address the 
law applicable for determining whether one tribal entity has delegated authority 
to waive the tribe's immunity to another tribal entity. [12] In our view, C&L 
Enterprises sets the outer limits of the "delegation law" and stands for the 
proposition that if state court jurisdiction can be predicated on a "clear 
waiver" of tribal immunity, no more is required to determine that the entity 
executing that waiver was delegated the authority to do so. And, just as no case 
has held that the words "sovereign immunity" must be used by a tribe to 
effectuate a waiver of immunity, no controlling authority has required the use 
of specific language before one tribal entity can effectively delegate authority 
to waive sovereign immunity to another tribal entity.
¶26 That conclusion still leaves us to determine what law to apply when 
deciding whether a purported delegation of authority to waive immunity has been 
sufficiently "clear." Although not controlling, we find some guidance on this 
point in federal law regarding the interpretation of treaties between Indian 
tribes and the federal government. "[W]e interpret Indian treaties to give 
effect to the terms as the Indians themselves would have understood them." 
Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196, 119 
S. Ct. 1187, 1201 (1999). "[T]his Court has often held that treaties with the 
Indians must be interpreted as they would have understood them." Choctaw 
Nation v. Oklahoma, 397 U.S. 620, 631, 90 S. Ct. 1328, 1334 (1970). In 
addition, the United States Supreme Court has determined that a "natural 
reading" of the treaty language can aid in the interpretation of the document. 
Id. at 634, 90 S. Ct. at 1336. Consequently, we will interpret the 
Tribe's Constitution and Resolutions as the Tribe appears to have understood 
those documents.[13]
¶27 The Constitution of the Apache Tribe of Oklahoma was first adopted on 
February 5, 1972, and the applicable document was last amended on June 20, 1987. 
Article III of the Tribe's Constitution states that the "supreme governing body 
of the Apache Tribe of Oklahoma shall be the [General] Council." Although no 
specific provision of the Apache Constitution authorizes it to do so, it is 
clear that the General Council has authority to waive the Tribe's immunity from 
suit. See e.g., Kiowa Tribe of Oklahoma, 523 U.S. at 760, 118 S. Ct. at 
1705 (inherent in a sovereign's immunity from suit is the power to waive that 
immunity). Further, the record in this case establishes that the Tribe has, on 
occasion, exercised its power to waive that immunity. The Apache Tribe conducts 
gaming operations in Oklahoma. To do so, the Tribe was required to enter into a 
Tribal Gaming Compact with the State of Oklahoma. 3A O.S.2011 § 262. The form of that 
contract is specified by statute and required the Tribe to waive sovereign 
immunity, subject to certain limitations, with respect to tort claims and prize 
claims against the Tribe and also required the Tribe to agree to waive sovereign 
immunity and arbitrate any disputes with the State of Oklahoma concerning the 
Compact. 3A O.S.2011 § 281; 
Sheffer v. Buffalo Run Casino, PTE, Inc., 2013 OK 77, 315 P.3d 359. Not only does the 
General Council have authority to waive the Tribe's immunity but also it may 
delegate that authority to another tribal entity even in the absence of any 
specific Constitutional provision to do so. "[T]he General Council may, by 
appropriate resolutions, delegate to the Business Committee the authority to 
waive sovereign immunity on behalf of the Tribe." (Tribe's Petition for 
Rehearing, p. 1). As stated, the fundamental issue in this case is whether the 
General Council delegated authority to waive the Tribe's sovereign immunity to 
the Apache Business Committee.
¶28 Article V of the Apache Constitution authorizes the establishment of a 
business committee and provides:

 
 This committee shall have such powers as may be delegated to it by 
 appropriate resolution of the General Council, and, within such delegated 
 authority, may transact business and otherwise speak or act on behalf of the 
 tribe in all matters on which the tribe is empowered to act now or in the 
 future.
Pursuant to this constitutional authority, the General Council established 
the Apache Tribal Business Committee and adopted two Resolutions defining the 
authority of that Committee. On August 26, 1972, the General Council passed 
Resolution 73-1 by a vote of 52 to 0, providing:

 
 WHEREAS, It has now come to the attention of the tribe to delegate more 
 authority to the Apache Tribal Business Committee.
 NOW THEREFORE BE IT RESOLVED: That the tribe does hereby go on record to 
 delegate its full and complete authority to the Business Committee to 
 transact any and all business related to the tribe involving matters such as 
 tribal land, tribal budget and any other matters relating to government 
 programs and the Bureau of Indian Affairs. . . .
On September 10, 1977, the General Council passed Resolution 78-7 by a vote 
of 32 to 0. That resolution provides:

 
 WHEREAS, The General Council of the Apache Tribe recognizes the need for 
 the Business Committee to have some authority, and needs this authority 
 without the necessity of calling a General Council to act on business for 
 the tribe. According to Article V of the Apache Constitution of the Apache 
 Tribe of Oklahoma and,
 WHEREAS, the Apache Tribe of Oklahoma does hereby go on record similar to 
 Resolution 73-1 to delegate authority to transact business related to the 
 Apache Tribe of Oklahoma
 NOW THEREFORE BE IT RESOLVED that this foregoing Resolution will go on 
 record for the Business Committee.
These three provisions constitute the documentation of the Business 
Committee's delegated authority in this record. Pursuant to this authority, the 
Business Committee adopted Resolution 06-23-08 by a vote of three to zero on 
June 23, 2008.[14] That Resolution approved the loan transaction with 
the Bank, adopted the form of the Loan Agreement containing the waiver of Tribal 
sovereign immunity, consent to jurisdiction in Oklahoma state and federal courts 
and arbitration provision contained therein. The 2008 Resolution also authorized 
the Chairman of the Business Committee to execute the Loan Agreement. The 
Chairman signed the Loan Agreement with the Bank the same day.
¶29 The Tribe raises essentially two arguments in support of its contention 
that the Business Committee did not have authority to waive Tribal sovereign 
immunity. First, the Tribe relies on the obvious absence of any specific 
reference to "sovereign immunity" in either Resolution 73-1 or Resolution 78-7. 
The Tribe contends that authority to "transact business" does not include 
authority to waive sovereign immunity. Therefore, the Tribe concludes, absent 
specific authorization to waive sovereign immunity by the General Council, the 
Tribe cannot be sued in Oklahoma state courts. As previously discussed, "[n]o 
case has ever held" that an Indian tribe must use the words "sovereign immunity" 
to effect an explicit waiver of that immunity. C&L Enters., 532 U.S. 
at 420-21, 121 S. Ct. at 1595. We will not be the first.
¶30 Second, the Tribe's argument misses the point. The question is not 
whether the General Council signed some document agreeing the Business Committee 
could waive sovereign immunity in conjunction with the Bank's loan. The question 
is whether the General Council authorized the Business Committee to waive the 
Tribe's sovereign immunity when necessary to "transact business." As previously 
discussed, the Apache Constitution authorizes the General Council to establish a 
business committee to "transact business and otherwise speak or act on behalf of 
the tribe in all matters on which the tribe is empowered to act now or in the 
future." We have previously established that one such "matter" is the General 
Council's authority to delegate the power to waive sovereign immunity to the 
Business Committee. The General Council may also define the limits of the 
business committee's authority by "appropriate resolution." In this case, the 
General Council did so through Resolution 73-1 and Resolution 78-7.[15] Therefore, 
interpretation of these resolutions determines whether the General Council 
delegated authority to the Business Committee to waive the Tribe's sovereign 
immunity.
¶31 The Tribe argues that the language of Resolution 73-1 delegating the 
Tribe's "full and complete authority to the Business Committee to transact any 
and all business" is limited to matters involving only "tribal land, tribal 
budget and any other matters relating to government programs and the Bureau of 
Indian Affairs." Because the Apache Constitution only authorizes the Business 
Committee to operate "within [its] delegated authority," the Tribe concludes 
that this grant of authority does not extend to matters outside those areas, 
including authority to borrow money to finance casino operations. We are willing 
to assume that Resolution 73-1 is as limited as the Tribe contends. It must 
follow, however, from a "natural reading" of Resolution 78-7 that the second 
resolution expanded the Business Committee's original limited authority. 
Resolution 78-7 contains a delegation of authority to transact business "similar 
to Resolution 73-1" but omits the restriction to tribal lands, tribal budgets 
and matters relating to government programs and the Bureau of Indian Affairs: 
"the Apache Tribe of Oklahoma does hereby go on record similar to Resolution 
73-1 to delegate authority to transact business related to the Apache Tribe of 
Oklahoma." The only qualification in Resolution 78-7 is that the business must 
be "related" to the Tribe. Because the subject matter of the two resolutions is 
clearly related and Resolution 78-7 specifically refers to Resolution 73-1, we 
find it reasonable to construe them together. And, from the language of 
Resolution 78-7, this is how members of the Tribe appear to have understood the 
relationship of the two resolutions. From the plain language of these two 
Resolutions, we conclude that the General Council delegated "its full and 
complete authority to the Business Committee to transact any and all business" 
on behalf of the Tribe including authority to waive the Tribe's sovereign 
immunity. [16]
¶32 Dilliner, analyzing an apparently identical constitutional 
provision, reached the same result. In that case, the tribal constitution also 
contained a provision granting the business committee "the power to transact 
business and to speak or act on behalf of the Tribe in all matters in which the 
Tribe is empowered to act." Dilliner, 2011 OK 61, ¶ 2, 258 P.3d at 517. 
Based on that authority, the Supreme Court held that the business committee had 
authority to waive the tribe's sovereign immunity. Dilliner, however, is 
distinguishable in one respect. In that case, the business committee adopted 
by-law and resolution provisions prohibiting any single member of the committee 
from acting on behalf of the committee and requiring the committee's consent by 
resolution to any waiver of sovereign immunity. The committee authorized the 
tribe's chief to sign employment contracts but because the committee did not 
also consent to a waiver of the tribe's immunity, the waiver provisions in those 
contracts were not effective and the tribe was immune from suit by the 
employees. Here, the Business Committee has not adopted any similar provision 
nor is there anything in the record limiting the Business Committee's authority 
to waive the Tribe's sovereign immunity or specifying the procedure by which 
that waiver must be accomplished.
¶33 This conclusion is supported by the evidence in the record reflecting how 
the Tribe understood the authority delegated to the Business Committee pursuant 
to these two Resolutions. As previously discussed, and as the language of the 
Tribe's Constitution confirms, part of the Tribe's "full and complete authority" 
is the authority to waive sovereign immunity as well as the authority to 
delegate the authority to waive sovereign immunity to the Apache Business 
Committee. We are convinced from a review of the relevant documents in this 
record that Tribal officials and members of the Apache Tribe understood 
Resolutions 73-1 and 78-7 as delegating authority to the Business Committee to 
waive the Tribe's sovereign immunity when necessary to "transact business."[17]
 
¶34 First, the members of the Business Committee who are also members of the 
Tribe certainly understood that they had the authority to waive the Tribe's 
sovereign immunity. Cf., Native Am. Distrib. v. Seneca-Cayuga Tobacco 
Co., 546 F.3d 1288, 1293 (10th Cir.2008), relying on belief of tribal 
business committee in establishing tribal entity to determine waiver of 
sovereign immunity. Resolution 06-23-08 notes that the Business Committee is 
vested with authority to negotiate and contract with private entities pursuant 
to Resolutions 73-1 and 78-7, and goes on to specifically approve the waiver of 
sovereign immunity expressed in the Loan Agreement. That Resolution is signed by 
the Chairman and Vice-Chairman. The Chairman and Vice-Chairman of the Business 
Committee are, pursuant to Articles IV and V of the Apache Constitution, also 
the Chairman and Vice-Chairman of the Apache Tribe. In addition, a Borrower's 
Opinion was issued on June 23, 2008, by the Tribe's legal counsel in conjunction 
with, and as a condition to, the Bank's loan. That document states, in part, 
that the Business Committee has the "full power to bind" the Tribe with respect 
to the Loan Agreement and has authorized the Chairman of the Business Committee 
to execute the Loan Agreement; that with respect to the Loan Agreement 
transaction, the Tribe has waived its sovereign immunity, consented to binding 
arbitration and to the jurisdiction of the courts of the State of Oklahoma, and 
that "all necessary tribal action required under the tribal law . . . has been 
taken by the [Tribe] with respect to the foregoing." Finally, a letter also 
dated June 23, 2008, from legal counsel for the Apache Gaming Commission states 
that the Business Committee is "authorized to transact business and exercise its 
powers as an Indian tribe and has approved" the Loan Agreement and that other 
than Business Committee Resolution 06-23-08, which was "duly approved and 
obtained," no Tribal approval, consent or authorization was necessary to 
effectuate the transaction contemplated by the Loan Agreement.[18]
¶35 Second, we note that the Arbitrator also found that pursuant to the 
authority granted in Resolutions 73-1 and 78-7, the Apache Business Committee 
"has repeatedly and routinely entered into contracts on behalf of the Tribe and 
waived the Tribe's sovereign immunity from suit." For the reasons stated in Part 
I of this Opinion, we have not relied on this finding in determining the 
jurisdiction of the Oklahoma courts. However, the record contains evidence of 
four transactions that support the Arbitrator's finding. In May of 2006, the 
Business Committee adopted a resolution approving agreements with Eagle Visions 
Gaming Group of Oklahoma, Inc., a Florida corporation, for the development, 
construction and financing of the Silver Buffalo Casino. A limited waiver of 
sovereign immunity was included in that resolution. In September of 2007, the 
Business Committee adopted a resolution selecting Icon Builders as the 
contractor for a sports bar at the Silver Buffalo Casino and authorizing the 
execution of a contract between the Tribe and Icon. That contract contained an 
arbitration agreement, consent to jurisdiction in federal court or "the state 
court of Caddo County" for the enforcement of any arbitration award and a 
limited waiver of sovereign immunity to the extent necessary to enforce "the 
arbitrator's decision." In November of 2007, the Business Committee adopted a 
resolution approving a loan to purchase property for the construction of a 
gaming facility. The resolution contained a waiver of sovereign immunity with 
respect to the loan transaction, agreement to arbitrate disputes, and a consent 
to be sued in federal court or, if jurisdiction was lacking, in the general 
jurisdiction courts of the State of Oklahoma to enforce any arbitration award or 
judgment confirming that award. In December of 2007, the Business Committee 
adopted a resolution approving a financial services agreement with KAGD, LLC. 
That resolution and the related document also contain a limited waiver of 
sovereign immunity. Each of the 2007 resolutions references Resolutions 73-1 and 
78-7 as the authority for the Business Committee's action. The 2006 resolution 
states that the Business Committee is acting "pursuant to its delegated 
authorities under the Constitution of the Apache Tribe of Oklahoma."
¶36 Therefore, pursuant to Resolutions 73-1 and 78-7, we find that the 
General Council delegated "its full and complete authority to the Business 
Committee to transact any and all business" including the authority to waive the 
Tribe's sovereign immunity when necessary to transact that business. It is 
undisputed that the Loan Agreement contains an express waiver of the Tribe's 
sovereign immunity and consent to be sued in the courts of Oklahoma which fully 
satisfy all requirements of federal law. Consequently, the district court and 
this Court have jurisdiction over the Tribe in this case.
III. Appellate Review of the Arbitration Award
¶37 The Tribe's second assignment of error regarding the confirmation of the 
arbitration award argues that the assignment of Casino revenues in the Loan 
Agreement converts that instrument into a management contract that must be 
approved by the National Indian Gaming Commission. Because there was no such 
approval, the Tribe argues the Loan Agreement violates the Indian Gaming 
Regulatory Act and is, therefore, void ab initio as is any purported 
waiver of sovereign immunity and consent to arbitration contained therein. This 
issue was litigated in the arbitration proceeding and the Arbitrator found that 
the "pledge of gross revenues does not make the Loan Agreement a management 
contract." The Arbitrator also concluded as a matter of law that the Loan 
Agreement was not void. The Arbitrator held, therefore, that the Bank was 
entitled to enforce the terms of the Loan Agreement which included the right to 
compel arbitration and enforce any arbitration award in Oklahoma or federal 
court.
¶38 The Tribe's argument concerns the validity of the Loan Agreement, not 
just the validity of the arbitration agreement. The Tribe argues that Oklahoma 
courts, not the Arbitrator, must decide that issue because it determines whether 
the Oklahoma courts have jurisdiction. However, the authority supporting the 
Tribe's argument has now been abrogated. See Nitro-Lift Techs., 
L.L.C., 133 S. Ct. 500 (2012). "[U]nless the challenge is to the arbitration 
clause itself, the issue of the contract's validity is considered by the 
arbitrator in the first instance." Buckeye Check Cashing, Inc. v. 
Cardegna, 546 U.S. 440, 445-46, 126 S. Ct. 1204, 1209 (2006).
¶39 As discussed in Part I of this Opinion, our review of the Arbitrator's 
decision that the Loan Agreement is not a void management contract is limited by 
the Federal Arbitration Act:

 
 (a) In any of the following cases the United States court in and for the 
 district wherein the award was made may make an order vacating the award 
 upon the application of any party to the arbitration--
. . . .
(4) 
 where the arbitrators exceeded their powers, or so imperfectly executed them 
 that a mutual, final, and definite award upon the subject matter submitted 
 was not made.
9 U.S.C. § 10 (2002).

 
 In either of the following cases the United States court in and for the 
 district wherein the award was made may make an order modifying or 
 correcting the award upon the application of any party to the 
 arbitration--
. . . .
(b) Where the arbitrators have awarded upon a 
 matter not submitted to them, unless it is a matter not affecting the merits 
 of the decision upon the matter submitted.
9 U.S.C. § 11 (1947). Sections 10 and 11 provide the "exclusive regimes" for 
judicial review of an arbitration award provided by the Federal Arbitration Act. 
Hall Street Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 590, 128 S. 
Ct. 1396, 1406 (2008). Determining whether the Arbitrator exceeded his authority 
in deciding that the Loan Agreement was valid in this case is determined by 
whether the parties agreed to arbitrate the "management contract" issue. 
Paragraph 11.24(a) of the Loan Agreement defining the matters the parties agreed 
to arbitrate includes "any action, dispute, claim or controversy of any kind . . 
. now existing or hereafter arising under or in connection with, or in any way 
pertaining to, any of the Loan Documents. . . ." Consequently, and unlike the 
issue of jurisdiction, the parties agreed to arbitrate whether the Loan 
Agreement was void because it was an unapproved management agreement. Because 
the arbitrator did not exceed his authority in deciding that issue, his decision 
will not be set aside. Kaplan, 514 U.S. at 942, 115 S. Ct. at 1923.
IV. Post-Arbitration Orders
¶40 In addition to the Judgment confirming the Arbitration Award, the 
district court entered three orders which the Tribe has appealed: the March 19, 
2012, Injunction, the March 27, 2012, Order and the April 3, 2012, Turnover 
Order. These orders were entered in aid of the Bank's efforts, begun in January 
of 2012, to collect its Judgment. For example, on January 10, 2012, the district 
court entered orders directed to four individuals including the manager of the 
Tribe's casinos to appear and answer as to the assets of the casinos. Those 
orders were entered pursuant to Oklahoma's enforcement of judgment statutes.

 
 At any time after a final judgment, order, or decree is filed, on 
 application of the judgment creditor, a judge of the court in which the 
 final judgment, order, or decree was rendered shall order the judgment 
 debtor to appear before the judge . . . at a time and place specified in the 
 order, to answer concerning the judgment debtor's 
property.
12 O.S.2011 § 842(A). During 
its collection efforts, the Bank learned that a certain amount of cash generated 
from casino operations was stored in casino vaults. On March 19, 2012, the Bank 
filed two motions, Plaintiff's Verified Ex Parte Petition for a Temporary 
Restraining Order (Ex Parte Motion), and Plaintiff's Motion for an Order 
Compelling the Turnover of Cash (Turnover Motion). The district court granted 
the Bank's Ex Parte Motion, entered the March 19 Injunction restraining 
the Tribe's use of casino funds.
¶41 On March 27, 2012, the Tribe filed its Motion to Vacate March 19 Order 
Granting Temporary Restraining Order. After a hearing in the district court held 
on March 27, the Tribe's motion to vacate was denied. On March 29, the Tribe 
filed its petition in error appealing the March 19 Injunction and the March 27 
denial of its motion to vacate. The Bank's Turnover Motion was heard on April 3, 
2012. At the conclusion of that hearing, the district court entered the Turnover 
Order. The Tribe filed its appeal of the Turnover Order on May 4, 2012.
¶42 The Tribe's objections to the three post-Judgment orders can be 
summarized as follows: (1) the district court did not have subject matter 
jurisdiction to enter the March 19 Injunction or the April 3 Turnover Order 
because the property affected is located on Tribal land, (2) the Tribe's March 
29 appeal of the March 27 Order denying its motion to vacate deprived the 
district court of jurisdiction to enter the April 3 Turnover Order, (3) the 
March 19 Injunction violates Rules 5 and 13(B) of the district court, is void 
because it was entered without the statutorily required notice and fails to show 
the requisite irreparable harm, and (4) the March 19 Injunction and the April 3 
Turnover Order are preempted by the Indian Gaming Regulatory Act.
A. Subject Matter Jurisdiction
¶43 The March 19 Injunction temporarily prohibited the manager of the Tribe's 
casinos from using casino cash for any purpose other than to pay winnings to 
casino customers until the Bank's Turnover Motion could be heard. The Turnover 
Order directed the Tribe to deliver $130,000 to counsel for the Bank. The Tribe 
argues that the district court lacked subject matter jurisdiction to enter these 
orders because the casinos are located on Tribal land. The Tribe contends that 
there is a difference between consenting to the jurisdiction of a state court 
and that court's power to exercise jurisdiction over property located on Tribal 
land. The Tribe notes that when Oklahoma was admitted to the Union, the 
inhabitants of the State disclaimed "all right and title in or to . . . all 
lands lying within said limits owned or held by any Indian, tribe, or nation . . 
. ." Oklahoma Enabling Act, 34 Stat. 267-278 § 3 (1906). This disclaimer is 
confirmed in Article I, § 3 of the Oklahoma Constitution: "The people inhabiting 
the State do agree and declare that they forever disclaim all right and title in 
or to any unappropriated public lands lying within the boundaries thereof, and 
to all lands lying within said limits owned or held by any Indian, tribe, or 
nation . . . ."
¶44 The Tribe cites cases recognizing that state courts do not have 
"jurisdiction over Indian tribes and tribal members in Indian country . . . in 
the absence of express authorization by treaty or by Congress" or waiver of 
sovereign immunity by the tribe. Waltrip v. Osage Million Dollar Elm 
Casino, 2012 OK 65, ¶ 19, 
n.7, 290 P.3d 741, 747, n.7. The 
Tribe concludes that even if it waived sovereign immunity, it did not consent to 
Oklahoma court jurisdiction over its property located on tribal land, citing 
In re Prairie Island Dakota Sioux, 21 F.3d 302, 305 (8th Cir. 1994) ("[a] 
waiver of sovereign immunity cannot extend a court's subject matter 
jurisdiction.").
¶45 The Tribe's argument fails for two reasons. First, the Constitutional 
disclaimer to any right and title to land owned by the Tribe is not a disclaimer 
to any interest to the proceeds of gaming operations conducted on that land to 
the extent that revenue was generated from nonmembers of the Tribe. Cf., 
Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 
498 U.S. 505, 111 S. Ct. 905 (1991) (state may tax sales of cigarettes on tribal 
land to nontribal members).
¶46 Second, the Tribe's argument fails to account for the possibility, as 
occurred in this case, that an Indian tribe may voluntarily relinquish title to 
its property wherever that property might be located. The Bank's ability to 
collect its Judgment in this case does not depend on an agreement with the Tribe 
creating jurisdiction in Oklahoma courts that otherwise did not exist, as was 
the case in the Prairie Island Dakota Sioux case. The district courts of 
Oklahoma have virtually unlimited subject matter jurisdiction. "The District 
Court shall have unlimited original jurisdiction of all justiciable matters, 
except as otherwise provided in this Article. . . ." Okla. Const. art. VII, § 
7(a). That jurisdiction includes jurisdiction to enforce judgments rendered by 
the district court. "At any time after judgment, any property of the judgment 
debtor . . . unless by law expressly excluded from being reached by creditors 
shall be subject to the payment of such judgment, by action, or as hereinafter 
provided." 12 O.S.2011 § 841. 
"The ultimate purpose of [Oklahoma's enforcement of judgment statutes, 12 O.S.2011 §§ 841 through 862] is 
to effect the application of a judgment debtor's property to a judgment." 
Ramco Operating Co. v. Gassett, 1995 OK 8, ¶ 12, 890 P.2d 941, 944. Consequently, the 
Tribe's waiver of sovereign immunity, choice of Oklahoma law and consent to 
enforcement of the arbitration award in the courts of Oklahoma did not create 
any subject matter jurisdiction the district court did not already have; it 
merely provided the Bank a judicial forum for the enforcement of its Judgment 
the Bank would not have had absent the Tribe's consent.
¶47 As noted by the United States Supreme Court in C&L 
Enterprises, 532 U.S. at 420, 114 S. Ct. at 1595, interpreting almost 
identical arbitration and choice of law provisions, the "regime to which the 
Tribe subscribed includes entry of judgment upon an arbitration award" in any 
court of competent jurisdiction including the district courts of Oklahoma. 
Id. As in C&L Enterprises, the Tribe agreed in paragraph 
11.24(b) of the Loan Agreement that: "Judgment upon any award rendered in an 
arbitration may be entered in any court having jurisdiction . . . ." But unlike 
the Potawatomi Tribe in C&L Enterprises, in this case the Tribe also 
specifically agreed that the district court was one of those courts:

 
 THE [TRIBE] HEREBY EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF 
 THE COURTS OF THE STATE OF OKLAHOMA . . . .
and IN THE EVENT A SUIT IS 
 COMMENCED ON THIS AGREEMENT . . . (INCLUDING FOR THE ENFORCEMENT OF AN 
 ARBITRATION AWARD), THE [TRIBE] COVENANTS THAT IT WILL NOT DISPUTE THE 
 JURISDICTION OF THE COURTS OF THE STATE OF OKLAHOMA . . . 
.
Paragraphs 11.27(B) and 11.27(D) (emphasis in original). We find the Tribe's 
argument that the district court did not have subject matter jurisdiction to 
enter the March 19 Injunction and April 3 Turnover Order unpersuasive.
B. Appellate Jurisdiction
¶48 The Tribe also challenges the district court's jurisdiction to enter the 
April 3 Turnover Order contending its March 29 appeal of the March 19 Injunction 
and March 27 Order denying the Tribe's motion to vacate deprived the district 
court of jurisdiction because its petition in error vested exclusive 
jurisdiction of the case in the Supreme Court, citing 12 O.S.2011 § 990.1: "When a 
petition in error is timely filed, the Supreme Court shall have jurisdiction of 
the entire action that is the subject of the appeal." The Tribe's argument is 
too narrowly focused.
¶49 For example, the Judgment confirming the Bank's arbitration award was 
filed on November 15, 2011. The Tribe's petition in error appealing that 
Judgment was filed December 13, 2011. Following the Tribe's argument, the 
district court lost jurisdiction of the case at that point. However, the Tribe's 
argument ignores the fact that even after an appeal is filed, the district court 
retains jurisdiction for some purposes including jurisdiction to decide the 
Tribe's motion to vacate[19] and jurisdiction to "take action with respect to 
any issue collateral to a pending appeal." See Supreme Court Rule 
1.37(a)(3) and (7). One matter collateral to the Tribe's March 29 appeal was the 
Bank's effort to enforce its Judgment. Grand River Dam Auth. v. Eaton, 1990 OK 133, ¶ 13, 803 P.2d 705, 709 (during appeal, 
successful party may enforce a judgment by execution, and collect its award, 
unless the defeated party secures payment of the judgment by deposit of money or 
an undertaking). The Tribe did not seek to stay enforcement of the Bank's 
Judgment pursuant to 12 O.S.2011 § 
990.4. Consequently, the Bank was free to pursue collection of its Judgment 
despite the Tribe's appeal. Cf., Lawrence v. Cleveland County Home 
Loan Auth., 1981 OK 28, ¶¶ 4 
& 6, 626 P.2d 314, 316 (appeal 
moot where appellant failed to stay the judgment appealed "by judicially 
approved stay process" and the transaction challenged on appeal had been 
completed).
C. The Notice Argument
¶50 As previously discussed, the district court issued an injunction on March 
19, 2012, restraining the Tribe, its casinos and the casino manager from using 
casino cash for any purpose other than the payment of winnings to casino 
customers. The Tribe contends the injunction was issued pursuant to Title 12 O.S.2011 § 1384.1.[20] The Tribe 
argues the Injunction was issued without the required statutory notice and in 
violation of the Rules of the district court prohibiting ex parte 
communications with the assigned judge and notice to the opposing side prior to 
entry of a temporary restraining order. The Tribe also argues on appeal that the 
Bank's collection action is one for money only and, therefore, that the Bank 
failed to show the irreparable harm necessary for the issuance of an injunction, 
citing section 1384.1(B)(1). This latter argument was not presented in the 
Tribe's motion for new trial and will not be considered for the reasons 
previously stated in Part IV (B) of this Opinion.
¶51 We find unpersuasive the Tribe's argument that the March 19 Injunction is 
void because it was issued without notice to the Tribe. Although styled as a 
temporary restraining order, the district court's March 19 Injunction is not a 
temporary restraining order. "The meaning and effect of an instrument filed in 
court depends on its contents and substance rather than on the form or title 
given it by the author." Whitehorse v. Johnson, 2007 OK 11, ¶ 8, n.13, 156 P.3d 41, 45, n.13. As the Bank 
points out, a section 1384.1 temporary restraining order is a precursor to a 
section 1382 temporary injunction. A temporary injunction is one issued "during 
the litigation." 12 O.S.2011 § 
1382. The March 19 Injunction was issued after Judgment had been 
entered.
¶52 Further, the March 19 Injunction was entered pursuant to Title 12 O.S.2011 § 842(A):

 
 At any time after a final judgment, order, or decree is filed, on 
 application of the judgment creditor, a judge of the court in which the 
 final judgment, order, or decree was rendered shall order the judgment 
 debtor to appear before the judge . . . to answer concerning the judgment 
 debtor's property. The judge may, by order, enjoin the judgment debtor from 
 alienating, concealing, or encumbering any of the judgment debtor's 
 nonexempt property pending the hearing and further order of the court. . . 
 .
Section 1384.1 does not apply to "proceedings brought pursuant to special 
statutes that provide alternate procedures for the obtaining of temporary 
restraining orders or temporary injunctions." 12 O.S.2011 § 1384.1(E). There is no 
prohibition in section 842(A) against the entry of an injunction preserving a 
judgment debtor's assets without prior notice to the party enjoined.
¶53 Finally, the district court issued the four January 2012 orders to appear 
and answer as to the Tribe's assets previously described. Those orders were 
issued pursuant to section 842(A) as well, and contained the same injunction 
prohibiting the alienation, concealment or encumbrance of casino assets 
contained in the March 19 Injunction, yet the Tribe did not object to or appeal 
those orders. As authorized by section 842(A), the district court's March 19 
Injunction ordered the Tribe not to use casino cash for any purpose other than 
the payment of winnings until the hearing on the Bank's Turnover Motion. That 
hearing was scheduled for the following day but, at the Tribe's request, was not 
held until April 3, 2012. The Tribe has failed to cite any legal authority 
supporting its argument that it was entitled to notice prior to the issuance of 
the March 19 Injunction.
D. The Preemption Argument
¶54 Finally, the Tribe argues that the district court did not have 
jurisdiction to enter the March 19 Injunction and April 3 Turnover Order because 
the court's authority to do so has been preempted by the Indian Gaming 
Regulatory Act, 25 U.S.C. §§ 2701 to 2721 (1988). The Tribe's preemption 
argument can be summarized as follows: (1) Pursuant to the IGRA, 25 U.S.C. § 
2701(5) (1988), the Tribe has the "exclusive right to regulate gaming activity" 
on Tribal land; (2) The IGRA was intended by Congress to completely preempt 
state law in this area; (3) The March 19 Injunction and April 3 Turnover Order 
interfere with the Tribe's regulation of its gaming activity. (4) The IGRA 
preempts the March 19 Injunction and April 3 Turnover Order.[21]
¶55 The federal preemption doctrine is derived from the Supremacy Clause of 
the United States Constitution. Felder v. Casey, 487 U.S. 131, 138, 1108 
S. Ct. 2302, 2307 (1988). When employed, the doctrine will restrain the 
enforcement of a state common law, statute or regulation. Cipollone v. 
Liggett Group, Inc., 505 U.S. 504, 522, 112 S. Ct. 2608, 2620 (1992). 
Preemption is either expressed in federal legislation or implied from 
Congressional intent. Pacific Gas & Elec. Co. v. State Energy Res. 
Conservation & Dev. Comm'n, 461 U.S. 190, 203-04, 103 S. Ct. 1713, 1722 
(1983). There is no express preemption of state law in the language of the IGRA. 
Therefore, the Tribe's preemption argument depends on whether preemption can be 
implied from the IGRA. Implied preemption is of two types, field preemption or 
conflict/obstacle preemption. Gade v. National Solid Wastes Mgmt. Ass'n, 
505 U.S. 88, 98, 112 S. Ct. 2374, 2383 (1992). The "ultimate purpose" in any 
preemption analysis is to determine whether state regulation is inconsistent 
with a federal law. Id. Consequently, the focus of the Tribe's argument 
is not just the March 19 Injunction or the April 3 Turnover Order but also the 
Oklahoma law pursuant to which the district court was authorized to issue those 
orders. As previously discussed, the March 19 and April 3 orders were issued 
pursuant to Oklahoma's enforcement of judgment statutes, 12 O.S.2011 §§ 841 through 862.
¶56 No United States Supreme Court decision has addressed the preemptive 
effect of the IGRA. That Court has, however, decided cases involving other 
federal statutes that provide the analytical framework for resolving the tribe's 
preemption argument. These cases teach that the language of the federal statute 
is critical to the analysis. See Gade, 505 U.S. at 98, 112 S. Ct. 
at 2383 (state licensing and training law that directly, substantially, and 
specifically regulates occupational safety and health is an occupational safety 
and health standard within the meaning of the Occupational Health and Safety Act 
and is preempted); Cipollone, 505 U.S. at 522, 112 S. Ct. at 2620 
(Federal Cigarette Labeling and Advertising Act preempted state law failure to 
warn claims but not breach of warranty claims); Bates v. Dow Agrosciences 
LLC., 544 U.S. 431, 125 S. Ct. 1788 (2005) (for state law to be preempted by 
the Federal Insecticide, Fungicide, and Rodenticide Act it must require 
"labeling or packaging" that is "in addition to or different from" the federal 
Act because that is the statutorily defined province of the FIFRA).
¶57 Although the IGRA has not been addressed by the United States Supreme 
Court, it has been the subject of decisions from federal Circuit Courts of 
Appeal. The Tribe cites Gaming Corporation of America v. Dorsey & 
Whitney, 88 F.3d 536 (8th Cir. 1996), for the proposition that the IGRA was 
intended to "completely preempt state law" in the field of the "governance of 
Tribal gaming activities." Id. at 544 (state law claims against law firm 
representing tribe during its gaming license process were preempted). The Tribe 
also relies on United Keetoowah Band of Cherokee Indians v. State of Oklahoma 
ex rel. Moss, 927 F.2d 1170, 1181 (10th Cir. 1991) (holding the IGRA bars 
federal courts from enjoining Indian bingo games through application of state 
criminal law because "Congress has clearly occupied the regulatory field on 
Indian gaming."). These decisions are thorough, well-reasoned and persuasive. We 
conclude, as did the Eighth and Tenth Circuit Courts of Appeal, that the IGRA 
preempts the field in the regulation of "gaming activity." 25 U.S.C. § 2701(5) 
(1988).
¶58 However, field preemption does not bar all state laws. Even though state 
laws that have a "direct and substantial effect" on the federal scheme are 
preempted, state laws of general applicability are not normally preempted. 
Gade, 505 U.S. at 107, 112 S. Ct. at 2387. See also, 
Gaming Corp. of America, 88 F.3d at 550:

 
 Those causes of action which would interfere with the [Tribe's] ability 
 to govern gaming should fall within the scope of IGRA's preemption of state 
 law. . . .
 Potentially valid claims under state law are those which would not 
 interfere with the nation's governance of gaming.
The March 19 Injunction and the Turnover order were issued pursuant to 
Oklahoma's enforcement of judgment statutes. Those statutes are generally 
applicable regardless of the subject matter of the litigation in which the 
judgment was entered. Consequently, for the Tribe to prevail it must demonstrate 
that those statutes regulate the Tribe's gaming activity.
¶59 We are aided in our determination of this issue by federal decisions 
involving the IGRA and other state laws of general application. See 
Mashantucket Pequot Tribe v. Town of Ledyard, 722 F.3d 457 (2nd Cir. 
2013) (state personal property tax on slot machines owned by non-Indians but 
leased to Indian tribe not preempted by IGRA even though tribe agreed to 
reimburse non-Indian lessor for the tax); Barona Band of Mission Indians v. 
Yee, 528 F.3d 1184 (9th Cir. 2008) (IGRA does not preempt state sales tax on 
construction materials purchased by non-Indians from non-Indians even though 
used to construct tribal gaming facility and tribe agreed to reimburse 
contractor for any state sales tax); Casino Res. Corp. v. Harrah's Entm't, 
Inc., 243 F.3d 435 (8th Cir. 2001) (IGRA does not preempt state common law 
breach of contract suit by non-Indian co-developer of tribal casino against 
other non-Indian co-developer that terminated negotiations with tribe); 
Confederated Tribes of Siletz Indians of Oregon v. State of Oregon, 143 
F.3d 481 (9th Cir. 1998) (preemption analysis unnecessary to determine impact on 
tribe's gaming activity of state investigative report because tribal/state 
gaming compact provided for the application of state law and pursuant to state 
open records law, investigative report was a public record).
¶60 In addition to these IGRA cases, we find particularly instructive the 
basis on which the Plurality in Cipollone found state law breach of 
warranty claims were not preempted by the cigarette labeling act.

 
 A manufacturer's liability for breach of an express warranty derives 
 from, and is measured by, the terms of that warranty. Accordingly, the 
 "requirement[s]" imposed by an express warranty claim are not "imposed under 
 State law," but rather imposed by the warrantor. . . . While the general 
 duty not to breach warranties arises under state law, the particular 
 "requirement . . . based on smoking and health ... with respect to the 
 advertising or promotion [of] cigarettes" in an express warranty claim 
 arises from the manufacturer's statements in its advertisements. In short, a 
 common-law remedy for a contractual commitment voluntarily undertaken should 
 not be regarded as a "requirement . . . imposed under State law " within the 
 meaning of § 5(b) [of the cigarette labeling act].
Cipollone, 505 U.S at 525-26, 112 S. Ct. at 2622. The Court elaborated 
on this analysis in footnote twenty-four: "common understanding dictates that a 
contractual requirement, although only enforceable under state law, is not 
'imposed' by the State, but rather is 'imposed' by the contracting party upon 
itself." Id., 505 U.S. at 526, n.24, 112 S. Ct. at 2622, n.24. This view 
was later adopted by the Supreme Court: "a cause of action on an express 
warranty asks only that a manufacturer make good on the contractual commitment 
that it voluntarily undertook by placing that warranty on its product." 
Bates, 544 U.S. at 444, 125 S. Ct. at 1788. Here, we also deal with a 
contractual provision voluntarily undertaken by the Tribe to submit to the laws 
of the State of Oklahoma for the enforcement and collection of any judgment 
entered on an arbitration award. As the Casino Resource court correctly 
noted: "Not every contract that is merely peripherally associated with tribal 
gaming is subject to IGRA's constraints." Casino Resource, 243 F.3d at 
439. The fact that the purpose of this contract was to obtain a loan to fund the 
Tribe's gaming operation does not change our conclusion. "Extending IGRA to 
preempt any commercial activity remotely related to Indian gaming-employment 
contracts, food service contracts, innkeeper codes-stretches the statute beyond 
its stated purpose." Barona Band of Mission Indians, 528 F.3d at 1193. 
Further, we find nothing inconsistent with Oklahoma's general enforcement of 
judgment statutes and the Federal Indian policy stated in the IGRA of promoting 
"tribal economic development, tribal self-sufficiency, and strong tribal 
government." 25 U.S.C. § 2701(4) (1988).[22] In short, the transaction resulting 
in the Loan Agreement is simply not in the "field" regulated by the IGRA. 
Consequently, the Tribe's preemption argument fails.
CONCLUSION
¶61 Pursuant to its constitutional authority, the General Council of the 
Apache Tribe of Oklahoma established a Business Committee and delegated to that 
Committee the Tribe's full and complete authority to transact business on behalf 
of the Tribe, including authority to waive the Tribe's sovereign immunity and 
consent to arbitration. The Business Committee was authorized to execute the 
Loan Agreement with Wells Fargo Bank. The Loan Agreement contains a clear and 
express limited waiver of the Tribe's sovereign immunity, a consent to arbitrate 
disputes and an agreement that any arbitration award can be reduced to judgment 
and enforced in the courts of Oklahoma. The Loan Agreement is enforceable 
against the Tribe. The Judgment of the district court confirming the arbitration 
award in favor of Wells Fargo Bank is affirmed except to the extent that the 
Judgment confirms the arbitrator's decision that the Loan Agreement contains a 
valid waiver of the Tribe's sovereign immunity. That portion of the Judgment is 
reversed. The district court's March 19, 2012 Order Granting Temporary 
Restraining Order, March 27, 2012 Order Denying Apache Tribe of Oklahoma's 
Motion to Vacate March 19 Order Granting Temporary Restraining Order, and April 
3, 2012 Order Compelling the Turnover of Cash Held at the Silver Buffalo and 
Golden Eagle Casinos are affirmed, and this case is remanded for further 
proceedings.

¶62 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER 
PROCEEDINGS.

BARNES, V.C.J., and WISEMAN, J., concur.

FOOTNOTES

[1] 
Although Judge Graves issued the Judgment confirming the arbitration award, 
Judge Croy issued the subsequent orders appealed.

[2] This 
Opinion was originally issued on December 31, 2013. We granted rehearing at the 
Tribe's request to address supplemental authorities relied on by the 
Tribe.

[3] 
Although the Tribe's Constitution refers to a "tribal council," the Tribe's 
documents in this record refer to a "general council" rather than the tribal 
council. It was established at oral argument that the terms are used 
interchangeably and describe the same entity, the "supreme governing body of the 
Apache Tribe of Oklahoma." We will refer to the Tribe's governing body as the 
General Council.

[4] A more 
detailed statement of the parties' transactions and the litigation history of 
this dispute is contained in the Arbitration Award.

[5] 
Although titled as a temporary restraining order, for the reasons stated in Part 
IV (C) of this Opinion, the March 19 Order is an injunction entered pursuant to 
12 O.S.2011 § 842(A), not a 
temporary restraining order.

[6] We 
apply federal law in this instance for the reasons stated in Part III of this 
Opinion.

[7] The 
Tribe argues that the Bank waived its right to rely on the Federal Arbitration 
Act by moving to confirm its arbitration award in Oklahoma district court 
pursuant to the Oklahoma Arbitration Act. The Tribe contends, therefore, that 
the Oklahoma Uniform Arbitration Act controls. The Loan Agreement does state 
that it "shall be governed by, construed and enforced in accordance with, the 
internal law of the State of Oklahoma." However, the arbitration provision 
provides: "All Disputes submitted to arbitration shall be resolved in accordance 
with the Federal Arbitration Act . . . notwithstanding any conflicting choice of 
law provision in any of the Loan Documents." After the Nitro-Lift 
Technologies, L.L.C. v. Howard, 133 S. Ct. 500 (2012), decision, we find no 
difference in the scope of judicial review regardless of which arbitration act 
is applied and the parties were unable to point to any difference at oral 
argument. Cf., Rogers, 2005 OK 51, ¶ 15, 138 P.3d 826, 830: "In Oklahoma 
state courts, the [Oklahoma Uniform Arbitration Act] determines how proceedings 
on an application to compel arbitration shall be conducted so long as the OUAA 
does not frustrate the purposes underlying the [Federal Arbitration Act]." 
Therefore, as the parties agreed in the Loan Agreement, we will apply the 
Federal Arbitration Act and federal decisions interpreting that Act.

[8] 
See Kiowa Tribe of Oklahoma, 523 U.S. at 756-60, 118 S. Ct. at 
1703-05, explaining the origins of the tribal sovereign immunity 
doctrine.

[9] We note 
that the record in this case is more fully developed regarding the authority of 
the Business Committee than was the record in First Nat'l Bank and Trust v. 
Maynahonah, 2013 OK CIV APP 
101, 313 P.3d 
1044.

[10] 
Like Kiowa, this case arises out of the breach of a commercial, 
off-reservation contract by a federally recognized Indian Tribe. The petitioning 
contractor, C & L, does not contend that Congress has abrogated tribal 
immunity in this setting. The question presented is whether the Tribe has waived 
its immunity.
To abrogate tribal immunity, Congress must "unequivocally" express that 
purpose. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 
56 L.Ed.2d 106 (1978) (citing United States v. Testan, 424 U.S. 392, 399, 
96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). Similarly, to relinquish its immunity, a 
tribe's waiver must be "clear." Oklahoma Tax Comm'n v. Citizen Band 
Potawatomi Tribe of Okla., 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 
1112 (1991). We are satisfied that the Tribe in this case has waived, with the 
requisite clarity, immunity from the suit C & L brought to enforce its 
arbitration award.
C&L Enters., 532 U.S. at 418, 121 S. Ct. at 1594.

[11] To 
the extent there is a difference, the more restrictive Santa Clara Pueblo 
rule could be interpreted to foreclose waivers based on conduct intended by a 
tribe to waive its immunity from suit or, if not specifically intended, waiver 
of immunity would be the unavoidable consequence of that conduct. Litigation 
conduct, for example, including voluntarily invoking state or federal court 
jurisdiction in lieu of tribal court alternatives, might require waiver of 
tribal immunity even in the absence of an unequivocal expression to do 
so.

[12] 
C&L Enterprises declined to specifically address the tribe's belated 
argument that the tribal officials who signed the contract containing the waiver 
of immunity did not have authority to do so. C&L Enters., 532 U.S. at 
423, n.6, 121 S. Ct. 1597, n.6.

[13] In 
its Petition for Rehearing, the Tribe criticizes this approach and argues for a 
strict construction against waiver and a resolution of all ambiguities in favor 
of the Tribe without regard to the Tribe's understanding of its internal 
documents. Pushed to its logical conclusion, this argument would result in a 
construction that produced a litigation victory avoiding commercial liability 
although every tribal member and tribal official believed the tribe had waived 
its immunity from suit for the transaction. We have found only two cases that 
seem to acknowledge this approach, Kiowa Tribe of Oklahoma, Inc., 523 
U.S. at 758, 118 S. Ct. at 1704 ("At one time, the doctrine of tribal immunity 
from suit might have been thought necessary to protect nascent tribal 
governments from encroachments by States"), and Sokaogon, 86 F.3d at 659 
("the only purpose that a requirement of a clear statement could serve would be 
the admittedly, perhaps archaically, paternalistic purpose of protecting the 
tribe against being tricked by a contractor into surrendering a valuable right 
for insufficient consideration.") We have found no case in which a court has 
engaged in a particular construction to protect the tribe from "itself." 
MM&A, 316 P.3d at 1253.

[14] The 
record contains what appear to be minutes of the annual meeting of the General 
Council held on June 21, 2008, and purporting to recall and remove the Chairman 
and Vice-Chairman of the Business Committee, two of the signatories to this 
Resolution. However, the record also contains letters from the Department of the 
Interior dated as late as October 22, 2008, recognizing the Chairman and 
Vice-Chairman as members of the Business Committee elected at a May 10, 2008, 
election. Article VII, Section 2 of the Apache Constitution provides that 
members of the Business Committee "shall serve until their successors are 
elected and certified." There is no evidence in this record of any election 
between the May 10, 2008, election and the June 23, 2008, execution of the Loan 
Agreement, and the Tribe does not contend that the Chairman and Vice-Chairman 
were not members of the Business Committee on June 23, 2008 or that they were 
not authorized to act on behalf of the Committee on that date.

[15] We 
recognize that these Resolutions and the general authority to transact business 
granted therein have been interpreted as not authorizing the Business Committee 
to cede Tribal jurisdiction to the Court of Indian Offenses with respect to 
internal tribal government disputes. See Apache Election Board, et al. 
v. Alonzo Chaleph, et al. and the Honorable Phil Lujan, CIV-06-A05P filed 
November 16, 2007, in the Court of Indian Appeals for the Apache Tribe of 
Oklahoma. We also find nothing in Resolutions 73-1 or 78-7 granting the Business 
Committee any authority over internal tribal government disputes. However, the 
Tribe's transactions with the Bank did not, at least initially, involve internal 
tribal government disputes.

[16] The 
"plain language" construction of these documents is consistent with the manner 
of interpretation utilized by the United States Department of Interior to 
interpret the Tribe's Constitution and was adopted by the United States District 
Court for the Western District of Oklahoma in Carattini v. Salazar, 2010 
WL 4568876, (W.D. Okla. November 3, 2010). Further, we are not persuaded by the 
Tribe's argument that there is a difference between authority to "transact 
business" and authority to "speak or act on behalf of the tribe in all matters 
on which the tribe is empowered to act now or in the future." These two phrases 
are joined by the conjunctive coordinate conjunction, "and." "Conjunctive 
conjunctions bring elements together. They have an additive function." Michael 
Strumpf and Auriel Douglas, The Grammar Bible 239 (Henry Holt and 
Company, 3rd ed. 2004). Consequently, within its delegated authority the 
Business Committee may transact business and speak or act on behalf of 
the Tribe unless specifically provided otherwise.

[17] The 
Tribe correctly notes that prior to execution of the Loan Agreement, a lawyer 
representing the Bank in this transaction expressed concern that approval of the 
General Council would be necessary because of the "lack of specificity" in 
Resolutions 73-1 and 78-7 regarding the Business Committee's authority to waive 
the Tribe's sovereign immunity. Although this opinion may reflect how the Bank 
understood these two resolutions, it does not provide any assistance in 
determining how members of the Tribe understood these Resolutions.

[18] The 
Tribe argues that these opinions are irrelevant citing Federal Crop Ins. 
Corp. v. Merrill, 332 U.S. 380, 68 S. Ct. 1 (1947) and Native American 
Distributing v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288 (10th Cir. 2008) 
for the proposition that a tribal official's mistaken belief regarding the scope 
of authority is not binding on the tribe. We recognize that "[i]t is a corollary 
to immunity from suit . . . that this immunity cannot be waived by officials." 
United States v. United States Fidelity & Guaranty Co. et al., 309 
U.S. 506, 513, 60 S. Ct. 653, 657 (1940). However, these two documents are not 
cited as acts constituting an unauthorized waiver of immunity by tribal 
officials but as evidence that the two lawyers representing the Tribe's entities 
in this specific transaction held the legal opinion that the Business Committee 
was authorized by the Tribe to sign the Loan Agreement and waive the Tribe's 
immunity to the extent stated therein.

[19] 
Although styled as a motion to vacate, we are required to treat the motion as 
the substance of the motion dictates. Knell v. Burnes, 1982 OK 35, ¶ 4, 645 P.2d 471, 473. The Tribe's motion 
asked the district court to reconsider its March 19 Injunction and, therefore, 
is properly treated as a motion for new trial filed pursuant to 12 O.S.2011 §§ 651 and 653. "A 
motion seeking reconsideration, re-examination, rehearing or vacation of a 
[decision by the court], which is filed within 10 days of the day such decision 
was rendered, may be regarded as the functional equivalent of a new trial 
motion, no matter what its title." Horizons, Inc. v. Keo Leasing Co., 1984 OK 24, ¶ 4, 681 P.2d 757, 759.

[20] 
Title 12 O.S.2011 § 1384.1:
A. No temporary injunction shall be issued without notice to the adverse 
party.
B. A temporary restraining order may be granted without written or oral 
notice to the adverse party or the attorney for the adverse party only if:
1. it clearly appears from specific facts shown by affidavit or by the 
verified petition that immediate and irreparable injury, loss, or damage will 
result to the applicant before the adverse party or the attorney for the adverse 
party can be heard in opposition; or
2. the attorney for the applicant certifies to the court in writing the 
efforts, if any, which have been made to give the notice and the reasons 
supporting the claim that notice should not be required; and the court 
determines that the efforts of the applicant to give notice, if any, were 
reasonable under the circumstances.
C. Every temporary restraining order granted without notice:
1. shall be endorsed with the date and hour of issuance;
2. shall be filed in the office of the court clerk and entered of record; 
and
3. shall define the injury and state why it is irreparable and why the order 
was granted without notice.
D. If a temporary restraining order is granted without notice, the motion for 
a temporary injunction shall be set down for hearing at the earliest possible 
time and takes precedence of all matters except older matters of the same 
character. When the motion comes on for hearing the party who obtained the 
temporary restraining order shall proceed with the application for a temporary 
injunction and, if the party does not do so, the court shall dissolve the 
temporary restraining order. On two (2) days' notice to the party who obtained 
the temporary restraining order without notice or on such shorter notice to that 
party as the court may prescribe, the adverse party may appear and move its 
dissolution, modification, or require the posting of an undertaking, and in that 
event the court shall proceed to hear and determine the motion as expeditiously 
as the ends of justice require.
E. This section shall not apply to temporary restraining orders in actions 
for a divorce, alimony without a divorce, separate maintenance, an annulment, 
custody, or similar matters, guardianship or juvenile proceedings, or to 
proceedings brought pursuant to special statutes that provide alternate 
procedures for the obtaining of temporary restraining orders or temporary 
injunctions.

[21] 
This "traditional preemption" argument is distinct from the comparable doctrine 
from which the Tribe's sovereignty is derived. Barona Band of Mission Indians 
v. Yee, 528 F.3d 1184, 1188-89 (9th Cir. 2008). The issue of preemption of 
state law by the doctrine of tribal sovereignty is addressed in Part II of this 
Opinion. Because we conclude that the Tribe intentionally and unequivocally 
waived its sovereign immunity when it signed the Loan Agreement, we are not 
required to undertake the balancing of interests analysis set forth in White 
Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S. Ct. 2578 (1980) to 
determine whether Oklahoma's enforcement of judgment statutes are preempted by 
the doctrine of tribal sovereign immunity. Cf., Sheffer v. Buffalo Run 
Casino, PTE, Inc., 2013 OK 
77, 315 P.3d 359 (absent a 
waiver of sovereign immunity tribe not subject to state dram-shop 
law).

[22] The 
Tribe's argument leads to an unsustainable conclusion: tribal economic 
development can only be fostered by laws that allow a tribe to borrow money for 
its economic enterprises without requiring the tribe to repay that 
debt.





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1956 OK 239, 302 P.2d 117, COUCH v. INTERNATIONAL BHD. OF TEAMSTERS, ETC.
Discussed
 2003 OK 70, 76 P.3d 653, IN THE MATTER OF THE DEATH OF BRYAN
Discussed at Length
 2004 OK 66, 95 P.3d 1087, PATTERSON v. SUE ESTELL TRUCKING CO.
Discussed
 2012 OK 96, 295 P.3d 1107, WILLIAMS COMPANIES, INC. v. DUNKELGOD
Discussed
 2013 OK 95, 318 P.3d 1105, CATTLEMEN'S STEAKHOUSE, INC. v. WALDENVILLE
Discussed
 2014 OK 30, 328 P.3d 1190, GRAHAM PUBLIC SCHOOLS v. PRIDDY
Discussed
 2014 OK 65, PEOPLELINK, LLC. v. BEAR
Cited
 1981 OK 108, 634 P.2d 723, Falcon Drilling Co. v. Thompson
Discussed at Length
Title 58. Probate Procedure
 Cite
Name
Level

 58 O.S. 240, Determination of Heirs, Devisees and Legatees under Certain Circumstances
Cited
Title 85. Workers' Compensation
 Cite
Name
Level

 85 O.S. 308, Definitions
Discussed at Length
 85 O.S. 315, Repealed by Laws 2013, SB 1062, c. 208, § 171, eff. February 1, 2014
Cited
 85 O.S. 337, Repealed by Laws 2013, SB 1062, c. 208, § 171, eff. February 1, 2014
Discussed at Length
 85 O.S. 340, Repealed by Laws 2013, SB 1062, c. 208, § 171, eff. February 1, 2014
Cited
 85 O.S. 3, Repealed by Laws 2011, SB 878, c. 318, § 87
Cited
 85 O.S. 3.1, Repealed by Laws 2011, SB 878, c. 318, § 87
Discussed at Length
Title 85A. Workers' Compensation
 Cite
Name
Level

 85A O.S. 400, Dissolution of the Workers' Compensation Court
Cited